Good morning, Your Honors. If I could reserve two minutes for rebuttal as well. Yes, you may. Good morning again. I'm here to argue for the appellant, Edison Burgos, who was a defendant in a capital trial that can be characterized, that was characterized as a drug case without any drugs, a murder case without a body, and an investigation and prosecution where the single common denominator was utter and accumulating lack of reliability in the evidence, in the testimony, and ultimately in the verdict itself. Today I want to address the salient aspects of the material misrepresentations in the Title III affidavit, even more in the search warrant affidavit, and then address several of the serious evidentiary flaws that took place in the trial, which create a real lack of confidence in the guilty verdict. I think it would be best, and I'd like to take about a minute to just give a, it's a, it was a very complicated case, and it took place over a long period of time, but if I could just take a little, a few seconds and give a brief timeline between September 2004 and September 2005. Carlos Hernandez, Madeline Semide's husband, got out of jail on September 30, 2004. About a week later, his wife, Madeline, goes to the DEA to initiate becoming an informant. She was already seeing and in a romantic relationship with Mr. Burgos for months. She's debriefed throughout the month of October, and she signs a confidential informant agreement on October 22nd. She moves in with Mr. Burgos. She makes recordings in November and December. She's debriefed. January, now we go to 2005. January and February, failed drug transaction and more debriefings. Fast forward to June 2006. It has been a failed investigation. There are no pending charges against Edison Burgos, no grand jury investigation, and her attentions as an informant switch to someone named Radames Castillo. Fast forward again to the very critical weekend, July 1st through 3rd, 2005. She, on the first, she has a horrible argument with Mr. Burgos that night. It's an argument about him being jealous about something. It has nothing to do with her being an informant. She leaves the next day for St. Croix, Saturday, July 2nd. For some reason, she returns the following day, Sunday, July 3rd. She's picked up by Mr. Burgos. She's taken to his house. She is not heard from again after slightly after midnight on July 4th, 2005. There is a DEA investigation in July of 2005. There's a police of Puerto Rico investigation in July of 2005. The Title III is finally requested in September of 2005. And there are several serious problems with the Title III. I've outlined them. I've more than outlined them in the brief. The material omissions refer to Madeline Semide and to Neftali Corrales. Regarding Madeline, the affidavit never explains, never sets forth that she's the wife of another DEA informant, that she's an informant out of fear for her own prosecution, that she is a very uncooperative informant who constantly, does not follow the advice of her handlers. That's why her statements would be unreliable. As to Neftali Corrales, very critically, he's always mentioned as an alleged co-conspirator. He's never mentioned as the cooperator informant that he was unrefuted for the police of Puerto Rico since 1998, for the NIA, which is a special investigation bureau of the police of Puerto Rico, since 1999. And very strong inferences that he was an informant for the DEA since 1999. That's something that the agents, the DEA agents investigating Madeline's disappearance actually knew. These were material omissions and this Title III affidavit was far from the reasonable, good faith effort toward putting the judge in a position to assess reliability that is required by this circuit. But I bring up that, and it's fully briefed and I certainly, I'm not abandoning any of those arguments on the brief, but I bring that up because the Title III was issued. There's a couple of recordings that were played at trial that came out in September of 2005. In December of 2005, Neftali Corrales, that same supposed co-conspirator, but actually an informant, has just finished testifying in the state murder trial where he's been the star witness. Radames, the new target, is arrested in Texas. It's a series, a chain of events that leads Corrales to believe that because he's involved in this investigation, he needs to go to the police. He eventually is debriefed by the DEA and the search warrant affidavit relies heavily, if not almost exclusively, on Corrales' representations. What the affidavit fails to state about Corrales is that he is a disgraced former police officer with numerous felony convictions, that one of the things he did as a police officer was be paid to perjure himself, that is paid by would-be criminal defendants to make their cases go away, to perjure himself. The affidavit does not reveal that he was a named interceptee, the affidavit does not reveal his stated motivations for coming to the DEA, and the affidavit does not state that at this murder trial where he had just finished testifying, the affidavit calls him reliable because he's given reliable information and was a witness at a state homicide trial. It doesn't say he was an immunized witness who was a participant in that homicide and that is why he was immunized. It also doesn't say that the defendant was acquitted in that trial. So those are serious material misrepresentations in the search warrant affidavit that should have been known to the issuing judge had the judge known it or the affidavit excised of those material misrepresentations would not have led to the searches of Mr. Burgos' farm and Mr. Burgos' car. At trial there were additional and very serious instances of where the jury was allowed to consider and deliberate upon and convict on entirely unreliable evidence. There are six evidentiary arguments, the last three refer to and implicate the improper use of expert testimony. All of these instances were improper. They cast the imprimatur of science, of scientific reliability on testimony and evidence that was nothing of the kind. They were all objected to. They all caused serious harm. First was about the three of them are the dogs, the cell tower information, and the DNA testimony. About the dogs, there was testimony implying that the dog alerts are reliable despite the way these dogs were trained, despite the way they were utilized and handled in this case. It was a very powerful and unwarranted inference that because dogs, cadaver dogs alerted Madeline Semide's body, although it was never found, nothing was ever found where the dogs alerted, it must have been there at some time. It was a very powerful use of very unreliable testimony. Next was testimony about cell towers and signifying that if this piece of paper, three pieces of paper, was Exhibit 27, it would indicate where Ms. Semide's cell phone was at any particular moment. It was a completely insufficient foundation, but it allowed the jury to infer about her whereabouts during that very critical weekend. And finally, the one that I wanted to focus on is the testimony of the DEA scientist, evaluator, testifier. If you open up a trunk of a car, what you see is the trunk liner. If you take out the trunk liner, you see the bottom of the car. The bottom of the car, there was a lot of stuff that looked like a horror show if you saw the picture. It turned out that was mostly battery fluid, and there were two, there were 14 samples taken. Two of them were blood. One of them was the blood of Ms. Semide. That was on a battery. It was on a label of a battery. It was a cloth label on a battery in the bottom of that trunk that had a drop of blood that was identified as her blood. That was all tested. That was that testimony. The trunk liner, that thing that had to be taken out, that was not tested until over a year later. There were numerous irregularities. The trunk liner was never brought to court. There were no photographs of the samples taken. There was a big discrepancy between five stickers and six that were testified, and then the report. There was no way to correlate those stickers with the areas, and nevertheless, Roberto Lopez, the expert, was allowed to say that his supervisor looked over his work, did not have a problem with that work, and therefore never told him there was anything wrong with his testimony. One of those samples was also positive to Ms. Semide's blood. Allowed to bolster his own, and this is my point, allowed to bolster his own testimony with the purported representation of another expert, his supervisor, who never objected to his work. He was allowed to bring in the bolstering imprimatur of another scientist who did not come to court and testify, and that's the claim concerning DEA. So those are my, I just wanted to give this court a, the brief has a number of other issues, but I wanted to give this court a real sense of the unreliability that permeated this trial from start to finish and cast great doubt on the verdict. How long did it take the jury to deliberate? Two days, more than two days. What was the defendant's explanation of the blood? There was, was the defense explanation of the blood? First of all, we, the photographs of the samples that were taken were very, it was, like I said, it looked like a horror show, and we, so we presented the evidence of all the stuff that wasn't blood inside the car. The battery was a battery that, the battery was the actual battery of the car. It was not being used because the car was in the shop, and another battery was being used. It was down on the bottom because of that. It really belonged in another place. The explanation is that just finding someone's DNA says nothing about when and where and how that DNA got there, and so there, and there's many instances of Madeline Semide using his car. There could have been many reasons why she hurt herself near the battery. The DNA, that very small DNA finding said nothing about the circumstances of the murder and if in fact there was a murder and who is responsible for that blood being in the car. How long had that battery been in the trunk as opposed to being in the car? Right. The car was taken to the shop at the beginning of November 2005. A new battery was placed in the car, and the other battery was placed where it was. The search took place, the car was seized December 29th. The search took place January 5th or 6th. So two months that the battery was on the bottom of the, not where the battery should have been. On the affidavits, on the omitted information, as I understand it, don't we essentially reread the application and put in all of the omitted information that you're pointing to and then ask whether it was an abuse of discretion for the trial court judge to assume, to conclude that the warrant still would have been issued had that omitted information been included? I thought that the, that's, I thought that the way, what this court should do is assume that that was, because of the material omissions that it's false information and excise the false information from the affidavits. When you excise the false information from that, it's one affidavit for two places. When you excise the false information, you, there is no probable cause to search the farm. There's no probable cause left to search the farm or to seize the car. So you're saying if an affidavit says Frank said X, and it doesn't disclose that Frank had something bad about Frank, that we have to remove X from the affidavit rather than add the thing about Frank that was bad? The affidavit purports to say that there are two reliable sources, CS1 and CS2. The affidavit omits material facts about CS1 and CS2, and so the information that's in the affidavit relayed from CS1 and CS2 should be excised. That's the request. Thank you. Counsel. Good morning, Your Honors. May it please the Court. My name is Francisco Bezos Martinez, and I represent the United States. I'd like to begin where actually counsel also began with the Title III wiretaps with regards to the necessity requirement and her discussion about the alleged omissions with regards to information relating to the confidential informants or the confidential informant at that time, Ms. Semide and Mr. Corrales. It should be noted that Mr. Corrales became a DEA informant after the wiretap was applied for and issued and after it had been subsequently sealed. It is, as a matter of fact, in the affidavit in support of the warrant, it specifically states, and this goes to the allegation that it was not disclosed that he was an informant or otherwise collaborated with other agencies. The affidavit specifically states that Mr. Corrales was interviewed by an NIE agent who then approached the DEA with information relating to his cell phone number, which was included as part of the wiretap application. And with regards to omissions relating to Ms. Semide and her relationship with Mr. Burgos, the government's position is that the specific nature of that relationship is irrelevant for personal probable cause. The warrant, sorry, the wiretap application affidavit made specific, very detailed accounts of her instances in which she was with the appellant and heard him or otherwise overheard him speak to other people relating to his drug activities. So as far as that goes, the government's position is that the specific nature of the relationship, although not specifically mentioned in the affidavit, was not relevant for purpose of the probable cause. Yes, but, you know, that's a sort of judgment call. The issuing judge might have found more context helpful, but you didn't give the district judge the opportunity to decide for himself, I think it was a himself here, that that information was pertinent. There does seem to be, at least on defense counsel's representations, a very careful tailoring of what is presented in order to get the wiretap and in order to get the subpoena. Well, let's move you on. There was just a dialogue about the appropriate test for looking at a claim that material information was omitted from an application or an affidavit in support of either Title III or a search warrant. What do you say the appropriate test is? The appropriate test with regards to the omitted information? Yes, Judge Kayada presented one model, defense counsel presented a different model. Well, I would argue that the appropriate test would be if the omitted information had been provided, would that have otherwise changed or made it less likely for the district judge to have issued the warrant? The government's position is that it would have not. With regards to counsel's contention that the omitted evidence required... Then why wasn't it put in the warrants? If it wouldn't have made any difference, why not give the judge that information? Well, the affidavit, the information provided on the affidavit need not include all the information provided from the investigation, derived from the investigation. It need only provide that information which is relevant to this application. In this particular case... Yes, but let's assume it was relevant, but then what is the test for whether a reversal is required? Are you back to your first statement that you add it to the affidavit and then you look at everything and you then determine whether probable cause is still there? I would say yes, Your Honor. With regards to... It's hard to tell from this record, but is it correct that one of the people cited in the affidavit as a source had participated in perjury? I believe that allegation was just made an oral argument by defense counsel as to the search warrant. As to the use of a particular, perhaps it was the Title III, the use of a particular individual who had been a disgraced police officer. Yes, that's correct, Your Honor. Well, in this particular instance, the affidavit was very particular in that instance, in which it was never alleged that his information was taken from the police. As fully credible based on his credibility, the affidavit made it specific that his allegations were corroborated through the DEA's investigation. I thought Ms. Brill said that he was described as being a reliable source of information. Are you saying that that word was not used? That was corroborated? What did it say? The specific language, Your Honor, I am not sure, but I am 100% positive that it was stated that his information was corroborated by agents. It wasn't an abusing language specifically stating that his statements were taken as credible in and of themselves. How do you defend the omission that a person is a perjurer? You say it's harmless error. Well, the omission with regards to, any omission with regards to his past conduct, I think is... Otherwise, what's the word? It's otherwise, for lack of a better word, because it doesn't come up right now, explained by that language saying the corroborating circumstances. You would say those corroborating witnesses were alone, even were sufficient. The corroborating information from the investigation was what made the allegations credible. It wasn't a fact that his trustworthiness or credibility was used as a means to say this information is credible. No, the affidavit just says the informant said this. We further corroborated, and it's from that corroboration that we're stepping now and making these affidavits. In terms of the evidentiary rulings, it would be the government's contention that, first of all, those with regards to the K-9 officers testifying, with regards to reliability and meaning of the K-9 alerts, it should be noted that these dogs were not only trained, but the officers themselves were trained with these dogs as well. So they were part of that training. They understood the training involved of these dogs individually and in conjunction with their officers who were their handlers. Given that and the fact that these were, and particularly in the instance of Mr. Agent Maisonette, who was a handler for a number of years and an instructor, that they had the requisite knowledge of the training to show that it was, in fact, reliable means of identification. As to the government hearsays with regards to the cell tower, the defense makes an issue of the fact that the person that otherwise was brought in to testify to, or rather for certification purpose of the records, was not an expert. Under the business exception rule to hearsay, it's not required for the custodian of records to be an expert or otherwise have been the person that made the record at the moment it was done. All that's required is to be shown that they are the ones that maintain the record and the ones responsible for it. And so I'm going to talk a little bit about Ms. Maisonette. Ms. Maisonette has been with us since the witness that was brought in by the government. She worked for the cell phone company for 10 years. She previously worked for a cell phone company which had since merged with another one and was designated as the custodian of records and the one responsible for the records relating to that now extinct cell phone company from which these records were made. They were brought. Was this information that was generally gathered and stored and kept? Yes, it was directly stored as part of the business practices. So it wasn't some new type of analysis or information or data run or something? No, Your Honor. The government simply requested the cell tower's information and they went into their system and brought us that information according to the request. In regards to the DNA expert's testimony with regards to having used his supervisor's bolstering testimony, it's not required. It's the position of the government that it wasn't brought as a bolstering testimony, but rather as part of the testimony establishing the procedures established by the company in finalizing a forensic examination. These were not brought in to say that, you know, because... You were giving a complete record. Exactly, following the protocol. Going to the first issue of juror dishonesty in this case. They make allegations that at one point a juror dishonesty was made. The husband of one of the witnesses stated that he was related to the juror foreperson. They brought in an allegation of juror misconduct, specifically alleging that the juror had with intent misled or misinformed or omitted information relating to his relationship to member participants in the trial. The record shows that, first of all, this was a case that a lot of the facts and a lot of the people involved were from Guanica and that the juror was in fact from Guanica. But first of all, he had left in 1987 to San Juan. This was information that was part of the voir dire process where he stated that he went to high school in Guanica. So it wasn't something that was otherwise a surprise to the defense at that point. Counsel, you're about out of time and I had a question that I wanted to ask, if you don't mind. With respect to the Title III application, there was a time at least when there would not be a Title III application without heavy involvement from the U.S. Attorney's Office anywhere in the United States. So that when the application was submitted, it was clear that the U.S. Attorney's Office had gone over with the agents about minimization. There had been a thorough review of the affidavit by an assistant U.S. attorney. Do you know what the record would show in this case with respect to whether the U.S. Attorney's Office was involved before the Title III was authorized? Well, significant participation would have taken part well before the application was even submitted, much less once it was authorized. That's my question, thank you. Thank you, Counsel. Your Honors, with respect to when Neftali Corrales became an informant, undisputed on the record in 1998 for the police of Puerto Rico, continuing all the way through December of 2001. I thought that the reviewing judge said that he was not, that the fact that the DEA didn't, or that the application didn't say that he was currently an informant was not incorrect. That is, for these other agencies, because that had been in the past. Did he not say that, or is it mistaken? I don't recall him saying that. He did say it's absolutely a mistake. He is absolutely a POPR informant since 1998, absolutely an NIE, Special Investigation Bureau informant since 1999. There is evidence, and it was brought out at the Title III pre-trial hearing and during trial, that he was a DEA agent, tried to conduct a kelo transaction with some other people since 1999. That's disputed, but there's evidence about that. The other two are undisputed, and the continuing nature is undisputed. The point is, he was... Wait, wait, the continuing nature is undisputed, but the judge found just the opposite with respect to the other agencies. I don't recall that, and it can't be. He is a witness. In 1999, he becomes an informant in this murder case. He goes to jail. Part of the plea is that he pleads guilty to certain crimes, goes to jail, gets out of jail, is housed in various places in the south of Puerto Rico by the NIE agents, and then he's housed there because eventually there's going to be this trial, which he testifies in, in 2005. The continuing nature from 1999 to 2005 is not... It was incorrect, and I hope I showed that. Can I just say about that, that the conclusion is that he was an active asset in the spring and summer of 2004, and in September when he could have been utilized, or at least attempted to be utilized. Thank you for the clarification.